938 A.2d 51

**Hanna GARVAL et al.**

v.

**The CITY OF ROCKVILLE et al.**

**No. 1999, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Dec. 28, 2007.

J. Edward Martin, Towson, for appellant.

Edward B. Lattner (Heather Mulloy, Marc P. Hansen, Acting County Attorney, on the brief), Rockville, for appellee.

Panel: HOLLANDER, SHARER, CHARLES E., MOYLAN, JR., (retired, specially assigned), JJ.

CHARLES E., MOYLAN, JR., Judge, Retired, Specially Assigned.

On cursory glance, this appeal appeared far more difficult than it needs to be. The analysis is compromised by the attempt on the part of the appellant to cram within the narrow

mold of staircase law what, in reality, is not a staircase problem at all.

The 92–year–old appellant, Hanna Garval, suffered a fall while attending, on May 8, 2004, a post-Bar Mitzvah reception at the Glenview Mansion, a facility that has been owned and operated for fifty years by the appellee, the City of Rockville. After the religious ceremony at a local synagogue, the attendees repaired to the Glenview Mansion at about 1:00 P.M. of a bright and sunny afternoon. They were served a meal and, after eating, many of the guests availed themselves of the opportunity to stroll about the grounds of the Mansion. When the appellant noticed that she was one of the last of the guests remaining in the dining area, she opted to join the others outside.

### A Step Is Not a Stair, Necessarily

The door from the Mansion opens onto a long patio that stretches across the entire rear of the building. The patio, in turn, opens up onto a surrounding lawn. The patio is, on the average, approximately 16 inches higher than the surrounding lawn. How to describe or characterize the progression from patio to lawn is one of the analytic enigmas haunting this case. From the entire outward-facing perimeter of the patio, the progression down to the lawn is graduated by what might be described as two intermediate steps. The totality might also be described, however, as a terraced patio, sloping gently downward by way of two intermediate levels. The vertical difference between the levels is but 5–½ inches, whereas the horizontal width of each intermediate level is approximately 19 inches. If this were a staircase, the "risers" and "treads" are supposed to have a different geometric relationship to each other. The ebb and flow of people between patio and lawn, around the entire perimeter of the patio, is not channeled into one or more staircases, and therein lies the fundamental flaw in the appellant's case. A staircase channels its human traffic flow. Movement from the patio to the lawn in this case suffers no such constraint.

When the appellant first came outside, she poised for a few moments looking out over the grounds and talking to her daughter-in-law, who was seated in a lawn chair just beyond the patio. Then for some unknown reason, the appellant fell onto the lawn and injured herself. The case proffered by the appellant attributed her fall and injury to the failure of the appellee to comply with regulations dealing with the construction and maintenance of stairways. At the very outset of argument in her brief, the appellant stated the hard core of her position.

> *There was no handrail at the accident scene which,* according to Plaintiff's expert witness, *was a violation of the building code,* rules and regulations and standards which are applicable to Montgomery County.

(Emphasis supplied).

The affidavit of the appellant's lone expert attributed the fall to three alleged design flaws for staircases: 1) the geometry of the risers and treads, 2) the absence of handrails, and 3) the absence of warning stripes or "nosings" at the outer edge of each tread. The expert's affidavit concluded:

> *There was no handrail provided on the steps where Ms. Garval fell and was injured. A handrail should have existed there.* In addition, the risers on the steps were not of uniform height and depth, the step nosings were not marked, the individual steps were very difficult to see for someone exiting from the porch area to the lawn area, particularly in bright light. *The width to the steps, the height of the steps and the absence of a handrail all violate applicable building codes.* It is my opinion that the condition of the steps was unreasonably dangerous and that the injuries sustained by Ms. Garval, which included significant injuries to her arm, wrist and elbow were proximately caused at the fall site by the improper maintenance of the stairs including the absence of safety features which should have been there.

(Emphasis supplied).

The regulations which the expert apparently had in mind (but did not identify) apply to the construction and mainte-

nance of staircases. The reference would have been to a code promulgated by the Building Officials Conference of America, Inc. (The BOCA Code), which was adopted by the City of Rockville in 1957. The provisions of the BOCA Code to which the appellant's expert was apparently referring, however, deal with interior, not exterior, stairways. The only occasion on which an exterior stairway is held to the standards of an interior stairway is that in which the exterior stairway is a "required exitway" from a building, a situation not remotely involved in this case. The appellant does not even address the subject.

In no way did the case proffered by the appellant counter, contradict, or even attempt to deal with the affidavit of the Chief of Inspection Services for the City of Rockville, who averred:

> [T]he City of Rockville adopted the 1955 Basic Building Code in 1957. That I *have reviewed the 1955 Basic Building Code and there are no violations of such code. The provisions* of the 1955 Basic Building Code *regarding "exterior stairways"*, specifically section 621.1, *do not apply to the stairs which are the basis of this lawsuit as the stairs are not a "required exitway".* 1955 Code provisions, attached. (Photographs in deposition exhibits 1a–1d.) The Glenview Mansion has sufficient marked required exitways and the stairs in question are not a required exit, and thus, *the City of Rockville is in full compliance with the 1955 Basic Building Code.* Thus, there *are no applicable requirements in the 1955 Code for handrails, uniformity of height and depth of risers, or marked step nosings on the subject steps.*

(Emphasis supplied).

The appellee's expert also explained how another general code, the Life Safety Code, had absolutely no applicability to the circumstances before us.

> I have reviewed the Life Safety Code, NFPA 101, year 2000, and *there are no violations of the Life Safety Code. The provisions of the Code* regarding "means of egress" *do*

*not apply to the area in question* as there are adequate designated exits which are marked as exitways, and *the area in question is not a "required exitway."* That therefore, *the City of Rockville is in full compliance with the Life Safety Code* and *there are no applicable requirements in the 1955 Code for handrails, uniformity of height and depth of risers or marked step nosings on the subject steps.*

(Emphasis supplied).

Without any sound basis for his opinion, the conclusory opinion of the appellant's expert was not enough to create a genuine dispute of material fact with respect to any negligence on the part of the appellee based on alleged code violations. The appellant was required to proffer not only what the particular provisions were but also how they even applied to the situation at hand.

The appellant's case, in Procrustean fashion, attempted to impose staircase law on a non-staircase problem. The broad patio and its surrounding lawn in this case are both on the same story. They are both ground level. To step down from the patio to the lawn is not to descend a staircase. The patio of the Glenview Mansion is a commodious venue for cocktail parties, receptions, and other convivial gatherings. Weather permitting, such gatherings would be expected to spread out onto the surrounding lawn. From every point along the outward-facing perimeter of the patio, 20 or 25 guests could, should they choose to march abreast, step out simultaneously onto the surrounding lawn without being channeled into one or more stairways.

Her daughter-in-law detailed the appellant's movements as she first strolled onto the patio. Her path, had it continued straight forward, would have carried her between two of the four columns that fronted on the lawn. The appellant veered to her right, however, to the righthand column of the two she had been facing. She actually moved beyond it, to the far side of the righthand column, and that is where she was poised just before her fall. It is the appellant's argument that a staircase, meeting fully the applicable City of Rockville specifications,

should have been sprouted downward from that spot. If, however, the appellant had paused on the near side rather than the far side of that column, should another staircase have sprouted downward from that spot? If, moreover, the appellant had initially veered to her left rather than to her right, should yet another staircase have sprouted downward from that lefthand column? Or two, perhaps, one from the near side and one from the far side?

As the patio faced out onto the lawn of the Mansion, its frontage was punctuated by four vertical columns, providing at least three openings facing forward onto the lawn. A fourth opening onto the lawn was afforded by the abutting depth of the patio itself between the fourth column and the side wall of the Mansion. Even if stepping down from the patio onto the lawn could, *arguendo,* be assumed to have implicated the full fury of staircase law, there is the question of how many staircases would then be required. Each of the four openings of the perimeter could accommodate at least two, and conceivably three, parallel stairways for a grand total of between eight and twelve such staircases for a surrealistic monstrosity instead of a gracious patio and lawn. If the appellant's position were pushed to the limits of its logic, the patio of the Glenview Mansion could be transformed into a Daliesque cornucopia of overflowing staircases.

To step from patio to lawn, albeit involving three steps instead of one, strikes us as an action far more akin to stepping off a curb or stepping from one level of a split-level living room to another than it is to descending a staircase. There may, to be sure, be hazards involved in taking such steps, but they would be hazards other than staircase hazards. Even a path wending its way through the garden may, in its course, encounter a step upward or downward, but that would not invoke the provisions of the Rockville City Code regulating the maintenance of safe stairways.

## Constraints on Appellate Review

In this case, the granting of summary judgment in favor of the appellee would in our judgment have been fully justified

on the ground that there was, as a matter of law, a complete absence of any showing of negligence. The appellant's theory of negligence was based on alleged violations of the Rockville City Code (the BOCA Code) with respect to the maintenance of stairways. No specific code provision, however, was ever identified or shown to have been applicable to the site where the appellant's fall occurred. The trial court, however, did not base its grant of summary judgment on the absence of any adequate proffer of negligence. We cannot, therefore, much as we might wish to, affirm on that ground.

■■■■ The reason we cannot is clear. Because a trial judge's decision to grant summary judgment may be fully sustainable, as a matter of law, by no means implies that granting the judgment is compelled. A trial judge almost always enjoys the option of declining to grant summary judgment even if, as a matter of law, he would be fully justified in granting it. It is for this reason that appellate courts ordinarily will not affirm a grant of summary judgment for a reason other than one relied upon by the trial judge.

Judge Harrell wrote for this Court in *Warner v. German*, 100 Md.App. 512, 517, 642 A.2d 239 (1994), as we set forth that general principle.

> [W]hen analyzing the lower court's decision, *we ordinarily are confined to the basis relied on by that court* and may not otherwise explain its conclusion by introducing new legal theories.

(Emphasis supplied). See also *Cheney v. Bell National Life Insurance Co.*, 315 Md. 761, 764, 556 A.2d 1135 (1989) ("[O]rdinarily we will not affirm the granting of summary judgment for a reason not relied upon by the trial judge."); *Geisz v. Greater Baltimore Medical Center*, 313 Md. 301, 314 n. 5, 545 A.2d 658 (1988) ("[T]he appellate court will not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon by the trial court, if the alternative ground is one as to which the trial court had a discretion to deny summary judgment.").

### The Road Not Taken

There was also, we note, a second road, not taken, that could probably also have justified the granting of summary judgment in this case. It could have been a determination that there was contributory negligence, *Robertson v. Shell Oil Co.*, 34 Md.App. 399, 367 A.2d 962 (1977), or the assumption of risk on the part of the appellant, *Kelly v. McCarrick*, 155 Md.App. 82, 841 A.2d 869, *cert. denied*, 381 Md. 675, 851 A.2d 594 (2004), as a matter of law.

As the appellant stepped out onto the patio and started to converse with her daughter-in-law, there was, just a few feet to her left, a highly visible and readily inviting ramp, fully wheelchair accessible, with sturdy handrails to both port and starboard. At one point in her deposition, the appellant expressly disclaimed the very notion of using a ramp: "Why would I need a ramp? That's for people in a wheel chair." After eschewing what was there just beyond her left hand, the appellant's complaint that there was no available handrail rings hollow. Because this possible basis for summary judgment, albeit urged by the appellee, was not addressed by the trial judge, it is not necessary for us to explore the utility of contributory negligence or assumption of risk as a basis for summary judgment.

### A Puzzle Without a Clue

In the Circuit Court for Montgomery County, Judge Marielsa A. Bernard granted Summary Judgment in favor of the appellee. She did so, however, on grounds other than the inapplicability of staircase law and other than the indisputable presence, as a matter of law, of either contributory negligence or the assumption of risk. It behooves us, therefore, to follow Judge Bernard's script.

Her position was that there had been proffered no legally sufficient evidence to establish a causal connection between the alleged structural defects and the appellant's fall. Even if we were to assume, purely *arguendo*, that the alleged defects actually were cognizable defects, we would still agree with

Judge Bernard that no causal connection between such hypothesized defects and the appellant's fall was even proffered.

No one, including the appellant, knows why she fell. She never stated that she lost her balance on the steps. She never stated that she was even yet on the steps when she fell. She never stated that she looked but failed to see that she would be stepping down to reach the lawn.

Q   All right.   So you were starting to walk towards your daughter-in-law by going down the steps?

A Yeah, I said to her that I would come down and sit there with her, you know.

Q . When you started to walk forward, *did you see the steps?*

A *I can't recall.*

Q   *Do you know which step you fell on?*

A *Not really.*

Q   *Do you remember if you had gone down one step, or two?*

A It happened so fast.   *It happened so fast I can't recall.*

Q   After you had been standing in that one position and started, *about how many footsteps had you taken before you fell?*

A *I don't know.*

Q   When you were standing at the top of the patio, *can you approximate how far away your daughter-in-law was from you?*

A *I can't really tell you that.   I don't know.*

(Emphasis supplied).

As Judge Bernard observed, the jury cannot be allowed to speculate as to what, out of infinite possibilities, might have caused the fall.   To choose one disputed actual observation of an event over another contradictory observation is a classic function of fact-finding.   To conjure up a theory out of nothing, by contrast, is rank speculation.   The absence of hard information that necessitates such speculation does not create

a genuine dispute of fact. A factual mystery, perhaps, but not a factual dispute. There was in this case nothing in the factual arsenal with which to wage a dispute. Did the appellant slip on something dropped by another guest? Nobody knows. Did the appellant simply get dizzy? Nobody knows. Was the cause of the fall an unsteady teetering on new shoes with 1-½ inch heels or having become entangled in a ballet-length full skirt or the pleasant elixir of a vintage Chardonnay at lunch or simply the vicissitudes of 92 years? Again, nobody knows. To establish a causative link under the circumstances would have been untethered speculation. Summary judgment was properly granted.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**